Good morning, Your Honors. May it please the Court, my name is Maria Baldini-Potterman, and I represent Petitioner Jose Orellana-Arias in this case. The first issue before this Court is does the harm that Petitioner suffered rise to, in the aggregate, to the level of past persecution? The second issue presented this morning is whether or not the Board's interpretation of a particular social group as presented by Petitioner is entitled to deference. The third issue is whether or not the Board erred in failing to find that he had established a nexus. And then the fourth is that the Board did not sufficiently consider his Convention Against Torture claim. Would it be difficult for you to start with the second issue first? No, Your Honor. I may start with the second issue as requested. Here's what I need to hear from you. In terms of the social group of individuals who are perceived to have money because they are returning from the United States, isn't this a dead end after Salgado-Gutierrez? Your Honor, with respect to that issue, I do believe that it is an issue that this Court has now addressed with respect to Salgado-Gutierrez. However, with respect to the first particular social group that we did present in briefing before the IJ, before the Board, and before the Court, I don't believe that this is a dead issue. The first particular social group is young Salvadoran males who oppose gang membership and their criminal activities on account of moral and religious beliefs. In this particular case, Petitioner had come to the United States several times and been deported several times. After he returned in 2007, he was not attacked. He was able to live peacefully there. He remained in the United States again for approximately four years, and in December 2011, he returned. And thereafter, over the course of 15 months, he was repeatedly attacked by the MS-13, extorted, threatened, and suffered on account of it. He opposed working with the MS-13, although he did provide the funds that the MS-13 requested. In the context of the first extortion that occurred, the MS-13 asked for $5,000. And I understand this goes to the second social group, but it's also part of the first social group. In the end, Petitioner ended up giving them $500, which is a large amount of money in El Salvador. He continued to give them smaller amounts of $1 to $5, but when they requested him twice on two different occasions to report when the police were around, he did not do so. But isn't it possible that the gangs thought that he was supportive of them because he gave them money? I'm sorry, Your Honor. Could you repeat the question? Wasn't it possible that the gangs thought he was supportive of them because he did give them some money when asked? Your Honor, if Mr. Orellana had refused to provide the money, then he feared that he would have been killed, as many people who refuse to cooperate with the MS-13 in El Salvador are killed. The record has numerous reports, including the U.S. State Department report, that demonstrate the control that the MS-13 has over literally the whole country, and anyone who does not comply with their demands faces severe consequences. He was a young male at the time that he did provide small amounts of money. He did not, however, call the MS-13 as the MS-13 had requested when the police were in the area. And in fact, in October of 2012, he was detained by plainclothes police, or people who portrayed themselves as being plainclothes police, beaten and handcuffed and interrogated about the MS-13. He was subsequently released from the police. He did, as you noted, provide the small amounts of money, but with respect to how the MS-13 operates, it creates literally fear within the communities through its actions. So in terms of did he support the MS-13, he provided the small amounts of funds following the first $500 extortion for the safety of his life and of his family. After he left El Salvador and fled to the United States, 15 months later in April of 2013, the MS-13 continued to look for him, and there was uncontroverted testimony from his wife in the record that the MS-13 had come to seek him out. So, Your Honor, we believe that because he falls in this group where he did oppose gang membership ultimately by fleeing El Salvador again to avoid the MS-13, and he was an active member of his church, and the church did oppose the gangs in its area of El Espinal, that this does constitute a particular social group. Does that include everyone who's active with their church and are a young male? I mean, I don't see where you draw the line on that. It's probably maybe a third of the population of the country. Your Honor, that was an issue that was not addressed by the board or by the immigration judge below, but in response to your question, if the person is actively involved with the church and the church is opposed to the gang activities, then the line could be drawn because some churches may not openly oppose the gang activities in El Salvador. With respect to the harm that Mr. Oriana suffered, a petitioner suffered in this case, the immigration judge found that it did not rise to the level of persecution, and the board affirmed that decision, that part of her decision. However, this court has said that you look at the acts in the aggregate, and in this case, within a 15-month period, he was beaten by the MS-13, extorted repeatedly, and threatened with death if he didn't cooperate. So over a short course of time, in the aggregate, we ask that this court find that he did suffer past persecution, because it wasn't just one incident, it was repeated incidents. With respect to the probability of future persecution, the government did not provide anything other than the State Department report to rebut the testimony of the petitioner and his wife, or the numerous articles that demonstrate that the government of El Salvador had negotiated a truce with MS-13. The truce had essentially broken down. The MS-13 was running its operations from even within the prisons and jails in El Salvador, and petitioner in this case had credibly testified that in one incident, when the police had stopped him looking for one of the three MS-13 members, Mr. Rivas, Oriana later saw Mr. Rivas walking down the street a few days later. He was clearly out of custody. The record evidence demonstrates that the government of El Salvador is unable to control the MS-13 and its gang members, whether they are incarcerated or they are on the streets. What evidence was there that the gang members knew that he was opposed to gangs other than his membership in the church? And, you know, they might or might not have known, I suppose, that he did not call them when he saw the police. But what other evidence would there be here? Your Honor, there is no other evidence in the record besides the fact that he did not call them. They had forced him to put a phone number into his cell phone to contact them when he saw the police. This number went into the phone, but he did not call them, despite the fact that he had actually been stopped, handcuffed, and interrogated by the police. With respect to the Convention Against Torture claim, the Board issued a one-sentence decision on this issue, which did not address the country conditions as discussed under what constitutes acquiescence that Petitioner had raised before it. The Board's decision with respect to the Convention Against Torture claim was clearly inadequate, and this Court should remand it for the Board to fully address his claims. Thank you, Your Honors. Thank you, Counsel. We will now hear from Mr. Stanton. May it please the Court. This case presents in the briefing many, many issues, and the briefs were fairly large as far as immigration cases are concerned. But I would submit to the Court that the resolution can be decided on much, much narrower ground, and the Court need not address some of the issues that were raised in the brief, although I am certainly willing to answer any questions regarding the issues in the brief the Court may have. Judge Walker, it's absolutely correct that the issue of whether people proceed to have wealth because they're returning from the United States has already been decided by this Court in not just one but two cases, the Dominguez case and also the Salgado case. So to the extent that petitioner is basing his withholding claim on membership in that group, that's just not connectable. Petitioner's other proposed social group, people who morally oppose gangs based on religious grounds, is also not a connectable social group. The Board held that such a group would not pass the social distinction test, but even if this Court is not prepared to address the merits of the social distinction test at this time, this Court has already said in the Getimi case that it had no quarrel with other decisions that held that such a variation of a group, opposition to gangs based on moral grounds, is not a cognizable social group either. Indeed, Judge Colton on the 8th Circus just a few years ago did a comprehensive look at the issue, and he concluded that courts have uniformly rejected variations of the same proposed social group that petitioner proposes here. So again, to the extent that the petitioner is basing his claim for withholding of removal on membership based on opposition to the gangs, that's just not a cognizable group. Even if it were, there's just not sufficient evidence to demonstrate the requisite nexus that the gangs knew of his opposition to them based on religious grounds. The Board's conclusion that the gangs may have targeted him because he was willing to agree to their demands was definitely supported by substantial evidence and should not be disturbed. And I would also submit that notwithstanding the language in the Dominguez case, otherwise a very fine decision that nexus determinations are reviewed for substantial evidence. It's not a question of law requiring a de novo review. This Court has said in the past we recite several cases in our brief, so that should be reviewed for substantial evidence. Mr. McDaniel. The immigration judge thought that the fact that Mr. Orellana Arias had to pay $500, although a significant sum, did not impose an extreme hardship or constitute persecution by itself. $500 is a lot of money in a place like El Salvador. But what happens if the gang members keep coming after him for money? And what will happen when he has no more money? Well, in the first place, as we said in our brief, Judge Roebner, we don't think the Board actually addressed the past persecution finding. But just to the extent your Honor is asking me the question, I mean, what would happen when he finally runs out of money to give him? The immigration judge concluded that if they're only asking for small amounts, $10, $5, it's probably not likely that the gang was willing to kill him over such a small amount of money. And there's nothing in the evidence compelling a reversal of that finding. But again, our position is that the Board did not address the merits of the immigration judge's past persecution finding, except to the extent that it was incorporated into the finding that there was no torture for his cat claim. Does that satisfy your answer? Does that satisfy your Honor? No. It's your answer, isn't it? It's your answer. It's my answer, yes. With respect to the Convention Against Torture, a petitioner in his reply brief has suggested that we have violated the Chenery Doctrine. But under this Court, the rule is clear that when the Board essentially agrees with the immigration judge, then the Court will review both the findings of the immigration judge as well as the Board's decision. Only to the extent that the Board has supplanted, disagreed with the Board's decision. So with respect to the grounds that we discussed in our brief, those are all in the immigration judge's opinion. The fact that the mistreatment he suffered, however unpleasant, does not rise to the level of torture. That's in the immigration judge's decision. The fact that there were no state actors, the immigration judge found that there was no likelihood that he would be tortured by Salvadoran officials and one other. But whatever it was, it was also in the immigration judge's decision. The only extent that the Board could arguably have supplanted the immigration judge's decision was the fact that it applied the correct willful-blindful standard required under this Court's precedence for Convention Against Torture claims and not the acquiescent standard. So to the extent the Board corrected the immigration judge's determination on that, then the Board's ruling on the CAC claim is otherwise supported by substantial evidence. You said there's no issue with state actors. Sometimes there's an allegation that the state doesn't do anything about these people. Apparently they arrest occasionally and they oppose it with this MS-13. I don't know to what extent there was a truce or something that didn't work. There was a truce, and my understanding is those discussions are still ongoing. In this particular case, there was evidence that the police were looking for the leader who was behind the mistreatment, Mr. Tamayo, if I pronounce his name correctly, the incident that the petitioner described where he was handcuffed and shot at. Again, very, very unpleasant, very, very frightening. I'm not disputing that, but the police were looking for the MS-13 gang leader, and I would submit that that is substantial evidence supporting the conclusion that the police were not willfully blind to the mistreatment, which again does not give rise to the level of torture in this particular case. I'd like to talk to you just for a moment because of the briefing about SESE. In SESE, pointed out that many social groups recognized by the board and courts are indeed quite broad. You know, women in tribes that practice female genital mutilation, persons who are opposed to involuntary sterilization, members of the Darut clan and Maran clan, sub-clan in Somalia, et cetera, et cetera. And that it would be antithetical to asylum law to deny refuge to a group of persecuted individuals who have valid claims merely because too many have valid claims. Does it matter that most of a population is probably opposed to gangs or that large numbers of people are wealthy or young or any of those categories under all of these circumstances? Well, we are aware and the board is also aware of this court's holding in SESE, or I'm not sure I pronounced it correctly, that over-breath cannot per se be grounds for failing the particularity test. But the board did try to address this court's concerns in its MEVG opinion in 2014 that particularity can, although it did use the word over-broad in its MEVG opinion, probably because other circuits do not follow this court's rulings on over-breath. But there were other examples of how a group could be too unwieldy to fulfill a particularity test. It could be in choke, it could be amorphous, which I think is probably, might be the issue here with respect to people who oppose gangs on whatever grounds. Your Honor is certainly correct under this court's precedence that over-breath cannot per se be on the bar to denial of relief. But to the extent it lacks boundaries, lacks social distinction, I would submit that that's a reasonable interpretation of the statute that the board, that this court should consider deferring to from the board. All right. And if there are any other questions, I'll rest on the briefs. Apparently not, sir. Thank you, Mr. Stanton. You have four minutes, counsel. With respect to the government's argument about the dollar amounts and the fact of whether or not there was Mr. Orellana had demonstrated his opposition, one thing that in particular led to Mr. Orellana's fleeing El Salvador in April of 2013 was that he personally knew the two bus drivers who were extorted and murdered by the MS-13 in February of 2013. Mr. Orellana was a farmer. He did not earn a lot of money. So he saw that other people, being the bus drivers who drove through his town on a daily basis, were murdered because they did not pay the amount of money demanded by the MS-13. With respect to the standard of review, this court has made clear in Dominguez-Palido that the standard of review for the nexus determination is de novo review, not substantial evidence, as the government argues. With respect to the Convention Against Torture claim, as we noted in our briefing before the board and before this court, this court has recognized in Rodriguez-Molinero that the lowest level officers within a government who do not protect others from torture can demonstrate acquiescence. In this case, it was clear from the testimony and also from the record evidence that police officers at the lowest level are unable to protect Salvadorans from torture by the MS-13. The record evidence also demonstrates the amount of corruption throughout the Salvadoran government, and particularly at the lowest levels, including judicial corruption. So we submit that Mr. Orellana did demonstrate by substantial evidence that he faces probable torture in El Salvador. We ask that this court reverse the board's decision and grant Mr. Orellana withholding or remand for further consideration. Thank you. Thank you, counsel. Our thanks to both counsel for their fine oral arguments today, and the case will be taken under advisement.